## Combs et al. v. Ezell et al.

## (And Six Other Cases).

(Decided January 31, 1930.)

J. S. GLENN and C. M. CROWE for appellants.

LOUIS I. IGLEHART, FLOYD LASWELL and SANDIDGE & SANDIDGE for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

These seven cases were heard together in the trial court; the plaintiffs in each case were unsuccessful. They have appealed, and all seven of the appeals were heard together in this court and will be disposed of in one opinion.

In 1868, James K. Mitchell and his wife, Jane Mitchell, moved from Tennessee to Ohio county, Kentucky, bringing with them nine children and thereafter three other children were born to them. About the year 1871, James K. Mitchell, with his wife and his family, moved upon a tract of land in Ohio county, Kentucky, containing 116 acres, and continued to live upon the land until his death, which occurred upon the 7th of June,

1877, and she resided thereon thereafter until her death on August 13, 1911.

James K. Mitchell died intestate, and left surviving him twelve children, three of whom were then more than 21 years of age. Near to this 116 acres was another tract of land, containing 65 acres, and by some means Jane Mitchell came into possession of that tract of land also.

On October 29, 1927, Lorena Crowe Martin, the only daughter of Tina Mitchell Crowe, who in turn was one of the twelve children of James K. and Jane Mitchell, filed a suit in the Ohio circuit court, naming as defendants, Ollie Ezell, W. E. Daily, J. W. Lowman, L. C. Young, L. P. Lee, and the children and heirs of James K. and Jane Mitchell, who are set out in full in the petition, but who are too numerous to mention here. In this petition she alleges that James K. Mitchell died intestate, in Ohio county, Kentucky, on June 7, 1877, and left a widow, Jane Mitchell, who died on August 13, 1911; that, when he died, James K. Mitchell was the owner of and in possession of two tracts of land, which adjoined each other, constituted one farm and were worth less than $1,000. She then describes the 65-acre tract and the 118-acre tract; she then sets out the names of the heirs of James K. Mitchell and Jane Mitchell, and shows her relationship to them; she says that Ollie Ezell has leased the coal, oil, and mineral rights under said land, and that the defendant lessees are now taking from the land many barrels of oil and are converting same to their own use; she alleges that she is the owner of one-twelfth of this land, that the land is indivisible, and she asks for the ejectment of the Ezells, that this land be sold for the purpose of partition, etc.

Answers and cross-actions galore were filed, and on November 22, 1927, six similar suits were filed by others, claiming to be heirs of James K. and Jane Mitchell, either as children, grandchildren, great-grandchildren, or great-great-grandchildren, all asking similar relief.

Defendants are now in possession of both tracts of land, and the very first task for the plaintiffs is to overcome that possession; therefore we shall state first just how the defendants are holding the property.

DEFENDANTS' CHAIN OF TITLE TO THE 65-ACRE TRACT.

On January 12, 1899, Jane Mitchell executed a title bond, by which and for the consideration of $150 she sold to William H. Simmons this 65 acres of land, which the bond says is known as the "Mat Nelson farm," and in this bond Jane Mitchell obligated herself, as soon as this $150 was paid, to make Simmons a general warranty deed for the property, and on the 23d day of August, 1906, she made such a deed, by which the receipt of this $150 was acknowledged, and the grantors in that deed conveyed this 65 acres to William H. Simmons and Nancy Simmons, his wife, reciting therein:

> "The grantor herein derived title in and to the property herein conveyed by peaceable possession and by judgment rendered in Ohio circuit court, June term, 1881. As per record in suit of Chas. Goodwin, Order Book No. 27, page 433, in said office."

The grantors who signed this deed were Jane Mitchell, Dan Mitchell, Lizzie King, Verda Combs, J. J. Mitchell, and Williaim Mitchell. The last five are children of James K. and Jane Mitchell. Why they joined in this deed does not appear. Two of these grantors, namely, Lizzie King and Verda Combs, were at that time married women, and, as their husbands did not join with them in the conveyance, as required by section 2128, Ky. Stats., their signing the deed amounted to nothing. No one but Jane Mitchell acknowledged this deed, which was recorded in Deed Book 44, p. 58, in the Ohio county court clerk's office, on November 23, 1912.

Thereafter, William H. Simmons and Nancy Simmons having died intestate, he on February 16, 1909, and she on December 13, 1912, leaving four children, one of whom is Annie Ezell, the other three children and heirs of Simmons and wife conveyed their interests in this 65 acres to Ollie Ezell and Annie Ezell by deed of general warranty, now of record in the Ohio county clerk's office in Deed Book 71, p. 275.

DEFENDANTS' CHAIN OF TITLE TO THE 116 OR 118 ACRE TRACT.

On the 17th of October, 1905, Jane Mitchell executed a general warranty deed, by which she conveyed to her son-in-law J. P. King the tract of land containing 116,

sometimes called 118, acres on which her husband, James K. Mitchell, was residing when he died, which she describes in the deed as "being a part of the Gookling (evidently meaning Goodwin) land conveyed to Mrs. Jane Mitchell by the Ohio circuit court. The grantor herein acquired title to the above-described property by peaceable possession, by judgment of the Ohio circuit court rendered at the June term, 1881, as per record in suit of Charles Goodiam (evidently meaning Goodwin) et al v. Squire L. Taylor et al., order book No. 27, p. 433, office aforesaid."

This deed was acknowledged by Mrs. Jane Mitchell on the 17th of October, 1905, and was on November 10, 1910, recorded in the office of the clerk of the Ohio county court. The consideration for this deed was $300, evidenced by nine notes, and the deed imposed upon the grantee, King, an obligation, after she had consumed this $300, to take care of Mrs. Mitchell the remainder of her life. Subsequently King and wife, on November 14, 1910, by deed of general warranty, conveyed this land to Ollie Ezell for a recited consideration of five notes, of $33.33 each, and in this deed Jane Mitchell joined, just why we know not, but probably it was for the purpose of releasing her claim for care or support, and of acknowledging the receipt of the other four notes King had given her, and in this deed Mrs. Mitchell reserved only the right to use house room for her bed, stove, and bedclothing. In this deed, this tract of land is described as containing 118 acres, and as being the same land conveyed to J. P. King by Jane Mitchell on 17th of October, 1905.

## Oil and Gas Leases.

On April 21, 1926, Ollie and Annie Ezell executed an oil and gas lease on the 65-acre tract to George S. Engle, which it is agreed by mesne assignments has passed to and is now owned by L. C. Young. On the same day Ezell and wife executed an oil and gas lease on another tract of land, described as containing 132 acres (the 116-acre tract is a part of this), to George S. Engle, and it is agreed that by mesne assignments this lease has passed to and is now owned by L. P. Lee and L. C. Young, and that Lee and Young have transferred their lease on 50 acres on the south end of this tract to J. W. Lowman and W. E. Daily.

Let us see just how Jane Mitchell was holding this 65 acres. We have already called attention to the fact that when she sold it she described it as the "Mat Nelson land." J. P. King, now over 60 years old, a son-in-law of Jane Mitchell, who has no interest in this matter whatever, and who never owned or attempted to convey the 65 acres, who was born and reared in Ohio county near this property, in this same neighborhood, said that when he first knew this 65 acres it belonged to Mat Nelson, and that Mat Nelson's two sisters, Jane Nelson and Sarah Nelson, were in possession of it; in the year 1883 there was a blacksmith's shop right across the road from the house where they lived on this 65 acres; that he and the son of the blacksmith were boyhood friends, and he was at the shop frequently; that one of these women, Jane Nelson, got married, and a neighbor, Moses Yates, organized two shifts of men to charivari them, one shift would charivari one night and the other shift the next night, and this was kept up for two or three weeks; that Jane Mitchell bought this 65 acres from Nelson, and, if she bought it, then, of course, she had a right to sell it, and the plaintiffs had no interest in it, and never had.

Plaintiffs must overcome this chain of title and oust the defendants in order to succeed, and we shall now state how they propose to do that.

### Plaintiffs' Chain of Title.

Plaintiffs claim under James K. Mitchell, and insist they have title to both these tracts, derived by them from him under the statutes of descent and distribution. It would be rather difficult to imagine how any one could manifest less title than plaintiffs manifest here. No deed is found or showing made by which James K. Mitchell ever acquired any title, other than this: James K. Mitchell was made a defendant in this old suit of Goodwin v. Taylor, but there is absolutely nothing to show what he was claiming. The deposition of an attorney was taken, who testifies that he had occasion to look into this old suit in the examination of some title, and that he then saw a deed from Goodwin, through Thornton, attorney in fact, to James K. Mitchell; but he was unable to say what land was conveyed to Mitchell, how many acres, where it was situated, or anything about it, further than that he saw a deed to Mitchell.

Since this attorney examined this old suit, the papers in it have been scattered and many of them lost. Copies of such as can now be found are in this record, and we have examined them. It was an action in ejectment. It was begun on October 1, 1873, by Charles Goodwin et al. against Squire L. Taylor and 31 others, one of whom was James K. Mitchell and another J. H. Jewell. Plaintiffs in that suit (Goodwin et al.) alleged they were the owners of 3,000 acres of land, which they described, and that the defendants had, by wrongfully keeping them out of possession of it, damaged plaintiffs $500, for which sum they asked judgment. The defendants, including J. H. Jewell and James K. Mitchell, answered jointly, denying the petition and alleging alternatively that if they were in possession of any of the land, they had held same adversely to the plaintiffs for more than 15 years. They further alleged they were in possession of the lands set out in their several deeds, filed as parts of their answer, upon which deeds they relied, but no description of the land they claimed is given in the answer, and these deeds have now been lost.

On June 11, 1881, it was adjudged that this petition be dismissed. Plaintiffs contend the dismissal of this suit by the court was an adjudication that Jewell, Mitchell, and the other defendants had title. Conceding, but not deciding, that, the question is: Title to what? Therein lies their difficulty. They failed to show what.

The Goodwins had described the 3,000 acres they were claiming. The plaintiffs could have had that surveyed, and then had this 116 or 118 acre tract and the 65-acre tract surveyed, and thus shown that these two tracts lie within the 3,000 acres, if they do; but for some reason best known to them they did not. They content themselves by introducing some witnesses, some of whom had not been born when this old suit was filed, and the others were then mere infants, who testify that they have always heard or been told this Mitchell land and the Jewell land were part of this 3,000 acres; but a court could not be expected to deprive any one of property upon such evidence, especially when, by proper surveys, the matter could be accurately determined.

Plaintiffs claim that James K. Mitchell then had a deed to the 65-acre tract, and that these two tracts were parts of this 3,000 acres; but, unfortunately for them they failed to prove these things. Plaintiffs claim that from what they have shown it may be inferred that in

this old suit of Goodwin v. Taylor it was established that James K. Mitchell had title to this 116 or 118 acre tract and J. H. Jewell had title to the 65-acre tract.

Of course it is possibly true that this 116 acres and the 65 acres were parts of the 3,000 acres involved in that litigation, and that James K. Mitchell then had a deed for the 116 acres, and J. H. Jewell then had a deed for the 65 acres; but we have no evidence these things are true. Conceding, however, but not deciding, that these things were established, then what next?

Plaintiffs introduce Fannie Lake, a lady about 70 years of age and a daughter-in-law of James K. Mitchell, and she testifies in a vague sort of way that James K. Mitchell bought this 65 acres from Jewell, and that the Nelson women were tenants of James K. Mitchell. She shows she knows but little about the matter. It necessarily happened about the time she was 17 years of age, and, with nothing to call it sharply to her attention, it is quite natural she knows but little about it now, after the lapse of over a half century.

Conceding that, for the sake of discussion only, then what next? James K. Mitchell died intestate on June 7, 1877, and, if he owned these two tracts of land, then they passed to his twelve children, subject to the claim of dower or homestead of his widow, Jane Mitchell. Plaintiffs alleged the land was worth less than $1,000; so we will, for sake of argument, accept that as true, and, if it is, then the reasonable inference is Jane Mitchell elected to claim homestead, and hence plaintiffs could not demand possession, so long as that homestead right of occupancy continued.

One of these twelve children, Louisa Mitchell, was born July 12, 1867, and died August 18, 1887, age 20 years, 1 month, and 3 days. Plaintiffs claim her interest was inherited by Jane Mitchell, but they are mistaken. It passed to the brothers and sisters of Louisa Mitchell. See section 1401, Ky. Stats. That statute is a part of an act approved December 19, 1796. See page 557, vol. 1, Littell's Laws of Ky.

Jane Mitchell died August 13, 1911, and, if plaintiffs were the owners of these two tracts of land, they then knew they were entitled to possession. They did nothing until October 29, 1927, when Lorena Crowe Martin sued, and twenty-four days thereafter the other six suits were filed.

We shall not undertake to discuss the various pleadings filed and steps taken, for there are over 1,100 pages of this enormous record devoted to those things alone, and in addition there are three large volumes of evidence. We shall content ourselves by saying the defendants denied everything the plaintiffs claimed, asserted title in themselves, and specially pleaded and relied upon the statutes of limitation.

## PLAINTIFFS' EFFORTS TO AVOID LIMITATION.

Plaintiffs contend, first, they could not sue so long as Jane Mitchell's homestead right continued. That, however, ceased when Mrs. Mitchell sold this land. See Anderson v. Sanders, 193 Ky. 364, 236 S. W. 561; Tobien v. Gentry, 183 Ky. 80, 208 S. W. 325; Overby v. Williams, 170 Ky. 140, 185 S. W. 822. Certainly it ended August 13, 1911, when Mrs. Mitchell died.

The plaintiffs are confronted by the provisions of this statute, pleaded and relied on by the defendants: "Sec. 2505. An action for the recovery of real property can only be brought within fifteen years after the right to institute it first accrued to the plaintiff, or to the person through whom he claims."

Since, without so deciding, and for the purpose of this discussion, we have conceded James K. Mitchell died the owner of these two tracts of land, then, upon his death, the title to this land vested in his heirs, and in the wake of the title there followed what is known in the law as a constructive possession of it by these heirs. See 2 C. J. 54. Constructive possession is a legal presumption that follows the title, and that perdures so long as does the title, unless it is overcome in some way.

Limitation does not begin to run until there is an adverse possession. Beeler v. Coy, 48 Ky. (9 B. Mon.) 312. That raises the question of adverse posssession. In Sackett v. Jeffries, 182 Ky. 696, 207 S. W. 454, 455, we said:

> "Title by adverse possession can only be acquired by the actual holding and enjoyment of land under a claim of right which is opposed to or inconsistent with any other claim. No possession of land is sufficient to ripen into title unless the holding has been such as to furnish the plaintiff a cause of action for the recovery of the lands every day during

the 15-year period. Possession must not only be actual, but it must be open, notorious, continuous, adverse, and peaceful for every hour of every day of the whole 15-year period.''

Ollie and Annie Ezell entered upon and held these two tracts of land under deeds of record in the proper office, and took actual, physical, corporeal possession of them; they paid the taxes on them, fenced them, and tilled them, and have since continued their ocupancy and their possession, either through themselves or their tenants.

Plaintiffs contend there have been breaks in this possession; for example, one tenant would move out, and it would be some weeks before another tenant would move in. Plaintiffs insist there must be a continuous occupancy. If the plaintiffs mean by this there must be continuously some one living on the land, they are wrong. A man may fence a field and use it as a pasture for cattle, and thus be in possession of it, and so remain for years without a human being on it, yet the possession is just as complete as if he were living in the center of it. See Cantagrel v. Von Lupin, 58 Tex. 570; Goodwin v. McCabe, 75 Cal. 584, 17 P. 705; Webber v. Clarke, 74 Cal. 11, 15 P. 431.

There are three ways in which the continuity of an adverse possession may be broken: (a) By an act of the real owner. (b) By the intrusion of a stranger. (c) By the abandonment of the premises by the occupant himself. Normant v. Eureka Co., 98 Ala. 181, 12 So. 454, 39 Am. St. Rep. 45. See 2 C. J. 94.

Nothing occurred under either heading (a) or (b), but plaintiffs insist the Ezells have abandoned their claim by moving off of the premises. Mere temporary absence from the property is not an abandonment, nor would leaving the premises with intention to reside elsewhere permanently be so if the claimant in some other way continued his possession and asserted his right to return, nor can the possession be said to have been abandoned, where the property is occupied, in right of the claimant, by his agent, servant, or tenant. See 1 R. C. L. p. 723, and cases there cited.

Adverse possession of land may be said to be founded in trespass; it must be a trespass constantly continued by acts on the premises. It must challenge the right of all the world; the claimant must keep his flag

flying, and present a hostile front to all adverse pretentions. The plaintiffs contend the Ezells failed to do this, because they would cultivate one patch of this land one year, and another and different patch the next year.

Still proceeding upon the concession made for purpose of discussion only, that deeds made the Ezells did not give them title, it must be admitted the Ezells had, by virtue of the deeds made them, at least color of title, and, having entered on this land thereunder, then they were in contemplation of law in possession of all the land within the boundaries given in those deeds, even though they had only exercised ownership over portions thereof. See 2 C. J. p. 235, and Kentucky cases there cited.

However, the Ezells fenced all of it, and, even though they cultivated one patch this year and another the next year, they were nevertheless in possession of all of it.

To avoid this, the plaintiffs say King and the Ezells were their joint tenants, and that they have the right to treat the possession of King and the Ezells as a friendly possession until actual notice was brought home to the plaintiffs that the Ezells were claiming against them. In support of this they cite Summer v. Vinson, 211 Ky. 571, 277 S. W. 849; Booten v. T. P. Robertson et al., 199 Ky. 302, 250 S. W. 1000; Johnson v. Myer, 168 Ky. 432, 182 S. W. 190; Kidd v. Bell (Ky.) 122 S. W. 232; Burchett v. Clark, 162 Ky. 591, 172 S. W. 1048.

The trouble they meet in this contention, however, is that King was not a joint tenant, but the deeds under which King and the Ezells were holding showed they were claiming to own in fee simple the whole estate.

The entry of a joint tenant is not ordinarily adverse to his cotenant; but when Mrs. Mitchell conveyed the entire property to King, and King conveyed the entire property to Ezell, the possession by Ezell is not a possession as joint tenant, but as owner of the land, and as, in fact, he claimed the whole land, the statute runs in his favor. See Cawood v. Middleton, 202 Ky. 745, 261 S. W. 242. See, also, Larman v. Huey's Heirs, 52 Ky. (13 B. Mon.) 443; Gillaspie v. Osburn, 10 Ky. (3 A. K. Marsh.) 77, 13 Am. Dec. 136; 33 C. J. p. 912, sec. 20.

As to the 65 acres, there is no question of joint tenancy presented. Thus we see that, conceding that plaintiffs did own this land at one time, they do not own it now. To own a thing, one must have a claim to it

which the courts will enforce. Ohio Valley F. & M. Ins. Co. v. Skaggs, 216 Ky. 540, 287 S. W. 969.

By section 2505 the plaintiffs lost their right to sue for the recovery of this when they failed to begin their action before August 11, 1926.

Plaintiffs contend the evidence of Annie Ezell should not have been admitted, but they made no such contention in the trial court; hence cannot do so here. Moreover, she was a part owner of the land; hence a competent witness on all matters touching the land she owned. They comment on the failure of Olie Ezell to testify, but the answer to that is they could have introduced him, had they so desired.

The judgment is affirmed.